**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**1:15cr85-12**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Vs.** | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| **TAMMIE LYNN PAYNE,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court upon Defendant's Motion to Suppress and *Franks* Request and Memorandum in Support (#158). The Government has filed the Government's Response (#184). The undersigned conducted a hearing in regard to: (1) whether or not Defendant was entitled to a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978); and (2) a hearing in regard to Defendant's Motion to Suppress. Having carefully considered the evidence, the brief, and the arguments of counsel, the Court enters the following findings, conclusions and recommendations.

## FINDINGS AND CONCLUSIONS

## I.     Procedural Background

Defendant is charged, along with 15 other defendants, in a multiple count Bill of Indictment. In count one Defendant is charged with the crime of conspiracy to distribute a quantity of methamphetamine in violation of 21 U.S.C. § 846. In count

twenty-seven Defendant is charged with possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1). In count twenty-eight Defendant is charged with possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A). In count twenty-nine Defendant is charged with, having been previously convicted with at least one crime punishable by a term of imprisonment exceeding one year, knowingly and unlawfully possessing a firearm in and affecting commerce in violation of 18 U.S.C. § 922(g)(1).

The Defendant filed her Motion to Suppress and Franks Request and Memorandum in Support (#158) on October 20, 2015. The Government filed it's Response to Defendant's Motion to Suppress and <u>Franks</u> Request and Memorandum in Support (#184) on November 6, 2015. The undersigned held a hearing in regard to the motion on February 24, 2016. In the motion, Defendant first requests that the Court hold a hearing pursuant to <u>Franks</u> to "assess the truth of the information supplied by law enforcement" in the application for a search warrant that had been issued on June 18, 2015, by A.J. Bryson, a North Carolina Magistrate Judge of Haywood County, North Carolina authorizing the search of a motel room or apartment where Defendant resided. It is the contention of Defendant that the search warrant was issued based upon untruthful statements and information

provided to Magistrate Judge Bryson and information deliberately omitted from the application for the search warrant.

## II.    Franks Hearing Request

In <u>Franks</u>, the Supreme set forth the standard which Defendant is required to meet to merit an evidentiary hearing in regard to such allegations.    The Supreme Court explained:

> [t]here is, of course, a presumption of validity with respect to the affidavit supporting the search warrant.   To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine.   There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.   They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons.   Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.   Allegations of negligence or innocent mistake are insufficient.   The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant.   Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.   On the other hand, if the remaining content is insufficient, the defendant is entitled under the Fourth and Fourteenth Amendments, to his hearing.   Whether he will prevail at that hearing is, of course, another issue.

<u>Franks v. Delaware</u>, 438 at 171-172.

The Defendant's motion was not supported by affidavits or any sworn or

otherwise reliable statement of any witness. Out of an abundance of caution, the undersigned determined to provide Defendant with an opportunity to present affidavits or sworn or otherwise reliable statements of witnesses, including live testimony, to show the falsity of any statement in the application for search warrant or deliberate or reckless misstatement of fact or relevant omission of fact in the application for the search warrant. The Court advised Defendant's counsel, after providing Defendant with that opportunity to present evidence or sworn statements, the undersigned would make a determination about whether or not a further hearing in regard to <u>Franks</u> would be required. The Court further advised the parties that a second hearing would then be conducted to determine whether or not there was probable cause for Magistrate Judge Bryson to issue the search warrant.

## III.    Factual Background

### 1.    Evidence of the Defendant in Regard to <u>Franks v. Delaware</u>

There was introduced into evidence a copy of the Application for Search Warrant and the Search Warrant consisting of eighteen pages. (Gov.'s Exhibit F-1.) In the Application for Search Warrant, Brad Miller, a law enforcement officer with the Waynesville Police Department, submitted what is denoted in the Application for Search Warrant as Attachment 4 Probable Cause. (Gov.'s Exhibit F-1.) In that portion of the Application for Search Warrant, Officer Miller avers that

the following is true.

I, Brad Miller, being a duly sworn Law Enforcement Officer with the Waynesville Police Department, do hereby make the following statement to establish probable cause. I have been in Law Enforcement for approximately 11 years. I am a member of the Waynesville Police Department Special Response Team. I have been a narcotics investigator with the Waynesville Police Department for approximately 4 years. I am currently assigned to the unified Narcotics Investigative Team (U.N.I.T.). I have executed numerous search warrants that have resulted in numerous arrests for possessing and trafficking controlled substance, including but not limited to possession of marijuana, cocaine, methamphetamine and trafficking opium. I have obtained my Advance Law Enforcement Certificate from the NC Training and Standards commission. I have completed training including, but not limited to, 32 hours of search and seizure and crime scene searches from C Justice Academy. I have completed approximately 66 hours of Drug interdiction from the DEA as well as other organizations. I have completed 75 hours of Police Law Institute from the NC Justice Academy. I have approximately 1,200 hours of various Law Enforcement training, accumulated from the NC Justice Academy and Haywood Community College. I have completed 80 hours of DEA Basic Narcotics training.

On Thursday, June 18th, 2015 detectives from the U.N.I.T. began surveillance at the Super 8 Motel at 79 Liner Cove Road. It was believed that Jeremy Bolin was in a room at this location possibly selling methamphetamine. It was known to Law Enforcement that Jeremy Bolin had outstanding warrants for his arrest.

Detectives of the U.N.I.T. began surveillance at the rear of the motel at approximately 3:30 p.m. on this date.

At approximately 4:45 p.m., on this date, a white in color GMC Envoy entered the rear area of the motel. I noticed several subjects inside of the vehicle. The vehicle had two white females in the two front seats as well as a male in the rear passenger seat behind the driver.

The vehicle came to a stop just long enough for the female in the front driver's side seat to exit the vehicle, while the white male passenger stepped from the rear seat and walked around the vehicle and got into the front passenger seat.

It was at this time that Detectives on scene recognized the male subject as being Jeremy Bolin.    After Bolin got into the front seat, the vehicle immediately backed from the parking space and edited the parking lot.

Uniformed Officers in the area, who were standing by, were notified by radio that Bolin was inside this vehicle.    Officer Evan Davis of the Waynesville Police Departments TAC Unit was in that area an observed after leaving the area.    Officer Davis stopped the vehicle as well as U.N.I.T. detectives who had been watching the activity at the motel.

During the vehicle stop, Jeremy Bolin was placed under arrest as he opened the passenger door of the vehicle.    Bolin has a history of running from law enforcement and he was taken into custody immediately.

The driver of the vehicle, Phillis Cooper was asked for her driver's license at which time Cooper stated that she had to get to work.    Ms. Cooper stated that she had just picked this guy up to give him a ride because he was walking a sweating.

Ms. Cooper then stated that she knew who Jeremy Bolin was and that he used to date her daughter.    Ms. Cooper changed her story several times.    Ms. Cooper was asked why she went to the Super 8 Motel and she said that Bolin just wanted to see if somebody was there.    I asked Ms. Cooper who got out of the vehicle and she said that there was no one in the vehicle besides herself and Bolin.    I informed Cooper that I had witnessed a white female subject get out of the vehicle as which time Bolin got into the front seat.

Ms. Cooper again changed her story and said that she dropped someone off there.    Ms. Cooper was asked if this person was Tammie Payne

and she said that it was Tammie somebody.

While speaking to Ms. Cooper, Detective Micah Phillips noticed what appeared to be a homemade magnetic box, setting in the center console of the vehicle. Through training and experience, it is common knowledge that these devices are used to hold and transport illegal substances including but not limited to methamphetamine, without being detected by law enforcement.

Ms. Cooper was asked if the vehicle she was operating was her own and she said that it belonged to her roommate.

Ms. Cooper changed her story again, this time claiming that Jeremy Blin and Tammie Payne picked her up at her work before bring him back to Haywood County. I asked Ms. Cooper where she was taking Bolin and she stated to drop him off at the rest area.

Sgt. Brandon Gilmore, a K-9 handler with the Waynesville Police Department arrived on the scene of the traffic stop. Ms. Cooper was asked to exit her vehicle and she did so. I stood at the front of Sgt. Gilmore's vehicle while he searched the vehicle with his K-9 partner Arco. While standing with Ms. Cooper, she made a statement, "I know how this goes". Ms. Cooper added, "I shouldn't have left my purse in there." I asked what she meant and she said that she quickly went into the bathroom of a store and left her purse in there with "them". I asked if she thought maybe that they put something in her purse and she said she hoped not.

I called Lt. Tyler Trantham over to my location and asked him if he would go ahead and check Ms. Cooper's purse because she was concerned that they may have put something inside of it.

Lt. Trantham did in fact look into Ms. Cooper's purse after K-9 Arco alerted on several location inside the vehicle including her purse. Lt. Trantham found a small zippered makeup bag which contained a small plastic baggie of a crystal/white substance believed to be methamphetamine.

Officer Evan Davis spoke to Ms. Cooper advising her that if she did in fact have any other illegal items on her person that she could be charged with another felony for bringing the items into the jail. Ms. Cooper advised Officer Davis that she did have another small baggie of methamphetamine in the small front pocket of her jeans. Officer Davis and I looked into the front pockets but found nothing. Ms. Cooper said that she remembered the she had put the small baggie of methamphetamine into her bra. Officer Pressley was advised of this and when Ms. Cooper got to the Haywood County Detention Center the small baggie of methamphetamine was found.

After the vehicle stop U.N.I.T. Detectives went back to their previous surveillance location in the rear parking lot of the Super 8 Motel.

While on surveillance, detectives observed Tammie Payne exit the rear door of the office of the Super 8 Motel. Ms. Payne was smoking a cigarette and talking on the cell phone. Ms. Payne did this several times while we watched. At one point Ms. Payne walked from the location of the rear office door, down to a utility/laundry room where she remained for several minutes. Upon exiting the utility/laundry room, Ms. Payne pushed what appeared to be a laundry cart back into the rear office entrance.

During one of the times Ms. Payne exited the rear, she met with a guy white male who appeared to be in her early 20's. The young man exited from a room the unmarked room described in Attachment 2. The young man met with Ms. Payne near the rear of the office by the breezeway that runs to the front of the building. They stood very close and it appeared that they were manipulating something in there hands. The male subject then walked through the breezeway, where he met with subjects in a white Dodge Truck. At one point, the male subject walked back to the rear of the building and got something out of a truck that was parked in the rear lot. The item appeared to be a container of automotive fluid. The male subject then walked back through the breezeway and entered the back seat of the truck. This truck was stopped by Waynesville Police Department Officers and the male subject was identified as Ryan Warren.

It was known to Detectives on scene were aware that Tammie Payne had an active warrant for her arrest. While Officers were on the vehicle stop, Detectives on scene observed Tammie Payne exit the rear of the office and get onto the elevator. Ms. Payne stepped from the elevator and stepped to her left, entering the first door on the left which has been described in Attachment 2.

Detectives approached the door that Payne had entered. Payne could be heard making noise inside the room and appeared to be manipulating keys and other items. As Ms. Payne opened the door to the room to exit, she was greeted by Det. Micah Phillips. Ms. Payne had some plastic grocery bags with items inside in her hands, which she quickly placed on the floor beside the door. Det. Phillips told Ms. Pain, who stood inside the open doorway that she had a warrant. Det. Phillips asked Ms. Payne if this was her room and she said yes. Detectives observed a zippered camo long gun case sitting on a table in plain view of the front door. Det. Phillips asked Ms. Payne if that was a gun and she said that it was. Ms. Payne added that it was not hers. Ms. Payne was told that she knew that she could not possess a gun and she said that it was Ryan's.

Ms. Payne was asked if it would be ok if we looked around to make sure there were no other guns in the room. Ms. Payne said that we could. Det. Phillips and I began looking in the room. I walked to the couch and turned over one of the cushions and observed a glass pipe. At this time Det. Phillips also noticed what appeared to be marijuana seeds in a box on an end table near the couch. Det. Phillips and I decided to back out of the residence and apply for a search warrant for the room.

While walking out of the room, the plastic bags which Ms. Payne had placed onto the floor when we first spoke to her lay partially open where a large stack of American currency could be seen. There was also a metal safe near the door which was closed.

Officers from the Waynesville Police Department TAC unit arrived and Ms. Payne was placed under arrest. Officer Evan Davis as well as Detectives Phillips and Whitley all stood by at the residence while the

search warrant was in the application process.

While waiting for the search warrant to be completed it was brought to the attention of the Officers on scene at Super 8 that Ms. Payne's purse had been located in the utility/laundry room by the property owner who had arrived on site. The property owner stated to Detectives that he was looking around to make sure none of his property or belongings had been stolen or damaged when he located the two purses that were in a small laundry room which is attached to the office. The property owner stated that he looked into the Ms. Payne's purses and saw the items that he believed to be illegal and immediately brought it to the Officer's attention.

Based upon the afore mentioned facts it is respectfully requested that a search warrant be issued for the location listed, an Apartment on the Second Floor of the Super 8 Motel at 79 Liner Cove Road, Waynesville, N.C. to recover and seize any and all controlled substances and items pertaining to illegal activities. As well as to search any and all subjects located inside of the aforementioned dwelling at the time of the execution of this warrant.

(Gov's Exhibit F-1.)

Det. Miller was called as a witness by the Defendant. Det. Miller testified that on June 18, 2015, he was employed by the Waynesville Police Department. (T. p. 19.) On that date, Det. Miller received information that there was large amounts of methamphetamine being sold at the Super 8 Motel in Waynesville. (T. p. 20.) He was further informed that Defendant Tammie Payne was living at the Super 8 Motel with a person named Jeremy Bolin who had outstanding warrants. (T. p. 22.) While Det. Miller was performing surveillance on the Super 8 Motel, he saw Defendant coming in and out of the back area of the general manager's quarters and

saw Defendant with Matthew Ryan Warren. (T. p. 25.)

Det. Miller was then advised by another Detective with the Waynesville Police Department, Micah Phillips, that there were outstanding arrest warrants for the arrest of Defendant. (T. p. 30.)   Those outstanding warrants were from charges pending against Defendant from 2011 from Jackson County, North Carolina and a charge of failure to appear on a driving while license revoked charge from Buncombe County, North Carolina. (T. pp. 31, 38-39.)   The charges from Jackson County included providing fictitious information to an officer, felony possession with intent to manufacture, sell and deliver a schedule II controlled substance, maintaining a vehicle/dwelling place for the purpose of keeping a controlled substance, driving while license revoked, possession of drug paraphernalia, improper registration, and no insurance. (T. pp. 38-39.)   Det. Miller further testified that if he knows there is an arrest warrant that has been issued and he encounters that defendant, it is his job to arrest that defendant. (T. pp. 39-40.)

During surveillance Det. Miller had seen an apartment from which Defendant had exited to meet with Matthew Ryan Warren. (T. pp. 25, 35.)   Det. Miller also saw Mr. Warren and Defendant manipulate something in their hands, which to Det. Miller was consistent with drug activity. (T. p. 35.)   Det. Miller and Det. Phillips then went to the door of the room to arrest Defendant on the outstanding warrants.

(T. p. 37.)    As they approached the door, Defendant was standing in the open doorway of the apartment (T. p. 37.)

Matthew Ryan Warren was called as a witness by Defendant. (T. p. 40.)    Mr. Warren testified that in June of 2015 he was homeless. (T. p. 44.)    He testified that Defendant had given him a place to keep his clothes and personal items until he could find a place to live. (T. pp. 43-44.)    Mr. Warren testified that he did not have a key for the apartment where Defendant lived at the Super 8 Motel. (T. pp. 44-45, 49.) Mr. Warren further testified that he had placed a rifle that he owned in the apartment of the Defendant more than a week prior to June 18, 2015, and he had in fact been keeping other items of personal property at Defendant's room for about two or three weeks. (T. pp. 47, 49.)    Mr. Warren testified he went to Defendant's apartment every other day to take a shower and clean up and grab some clothes. (T. p. 49.)

Ken Patel was called as a witness by Defendant.    Mr. Patel manages what was formerly the Super 8 Motel and which is now known as Motel 6 in Waynesville, North Carolina for his parents. (T. pp. 54-55.)    On June 18, 2015, Defendant had been working for Mr. Patel as a front desk clerk for a couple of months. (T. pp. 59, 61.)    Defendant would work the shift from 3:00 p.m. to 11:00 p.m., four to five days per week. (T. p. 56.)    On June 18, 2015, Mr. Patel was having dinner and

received a call from a police officer stating that his desk clerk was being arrested and he needed to come to the Super 8 Motel. (T. p. 59.)   Mr. Patel identified the witness, Mr. Warren, as being the boyfriend of Defendant because he had seen Defendant and Mr. Warren regularly at the motel and knew Mr. Warren was living in an apartment at the motel with Defendant. (T. pp. 57, 62-66.)

Defendant introduced into evidence without objection, a document marked as DF-1 showing that Matthew Ryan Warren was charged with maintaining a vehicle or dwelling place for the keeping of a controlled substance on June 18, 2015, and document DF-2, a computer printout showing that Matthew Ryan Warren was charged on June 18, 2015, with felony conspiracy to sell methamphetamine.

### 2.    The Additional Evidence Offered by Defendant

After the Court entered a ruling concerning Defendant's request for a <u>Franks</u> hearing and began to hear the parties in regard to the Motion to Suppress, Defendant requested that the Court reopen the <u>Franks</u> hearing and give Defendant an opportunity to present further evidence. (T. pp. 87-90.)   Out of an abundance of caution and to prevent any prejudice to the Defendant, the undersigned allowed Defendant to present further evidence and considered it in regard to Defendant's request for a <u>Franks</u> hearing. At that time, Defendant presented the following additional evidence.

Det. Brad Miller was called again as a witness by Defendant, and he testified that he had been in law enforcement for approximately eleven years. (T. p. 92.) He had been a narcotics investigator with the Waynesville Police Department for approximately four years. (T. p. 92.) He testified he had obtained an advanced law enforcement certificate through the State of North Carolina Training and Standards Commission, received 32 hours of search and seizure crime scene training at the North Carolina Justice Academy, received 66 hours of drug interdiction training from the Drug Enforcement Administration, received 72 hours of Police Law Institute training from the North Carolina Justice Academy, and received 1,200 hours of various law enforcement training. (T. p. 92.) He had also received training in the form of identification of drugs and controlled substances. (T. p. 93.)

Det. Miller testified that as he and Det. Phillips approached the door to the apartment of the Defendant, the Defendant was standing in the open doorway of the apartment. (T. p. 37.) Defendant said the apartment was her residence. (T. p. 94.) Det. Miller spoke to the Defendant at the door of the apartment, and at that time he could see there was a gun case that was in plain view in the room. (T. p. 94.) Det. Phillips asked Defendant if that was a gun and Defendant responded that it was. (T. p. 94.) Det. Phillips then told Defendant she could not legally possess a firearm and the Defendant replied that the gun was not hers, it was Ryan Warren's gun. (T.

p. 94.)   Det. Miller then spoke to Defendant about the outstanding warrants and asked if she would mind if they looked in the residence for other firearms, to which Defendant replied, "oh sure." (T. p. 94.)

At that point, Detectives Miller and Phillips each walked through the room with the consent of Defendant for the purpose of performing a protective sweep for firearms and any other persons that might be in the room. (T. pp. 94, 113.)   While looking through the room, Det. Miller noticed some Tupperware containers with duct tape over them. (T. p. 95.)   As he pulled back a couch cushion, he also found a glass pipe that was consistent with glass pipes he had observed in the past that are used to inhale or ingest drugs. (T. pp. 94, 108-109.)   Det. Phillips stated he had found marijuana seeds and some "shake". (T. pp. 107-108.)   The seeds were of the type you would plant to produce marijuana. (T. p. 108.)   "Shake" is crumbs of marijuana. (T. p. 108.)   At that point, Det. Miller told Det. Phillips they should back out and obtain a search warrant. (T. pp. 96, 108.)   Det. Miller testified that at that time in addition to apprehending Defendant for the outstanding warrants, he was now investigating Defendant for the crimes of being a felon in possession of a firearm, possession of a controlled substance, that being marijuana, and possession of drug paraphernalia. (T. pp. 110-111.)

Det. Miller then posted an officer at the door of the apartment and went to

present an application for a search warrant for the apartment. (T. p. 113.)   While he

was preparing the application, he received further information through a telephone

call from other officers. (T. p. 114.)   In the telephone call, the officers told Det.

Miller that Ken Patel, the owner of the Super 8 Motel, had come to the motel and

found in a laundry/utility room that was on the first floor of the motel, two purses.

(T. pp. 99-100, 102, 104-106.)   Mr. Patel had examined the purses and found

identification documents in the purses indicating they were owned by the Defendant

and, what he believed, were three bags of controlled substances. (T. pp. 99-100, 102,

104-106.)

Ken Patel was again called as a witness for the Defendant.   Mr. Patel testified

that when he arrived at the Super 8 Motel during the evening of June 18, 2015, he

found a customer waiting, whom he checked into a room.   (T. p. 115.)   He then

went into a laundry room that is behind the front desk.   (T. p. 115.)   There he

found a purse on a table where laundry is folded. (T. p. 115.) He opened the purse

and found an identification document for the Defendant. (T. pp. 115, 118, 121.)   He

also saw a couple of bags, which he thought contained medicines or drugs. (T. pp.

115-117.)   He told law enforcement officers about the purse, and they told him not

to touch the purse because they wanted to get a warrant. (T. p. 117.)   The laundry

room is located on the first floor of the Super 8 Motel, and the apartment where the

Defendant lived was on the second floor. (T. p. 119.)   When he found the purse, he told law enforcement officers he had found Defendant's purse and there were a couple of things in the purse the officers might want to look at. (T. p. 120.)   Mr. Patel wasn't sure whether the contents of the purse contained drugs or medicines. (T. p. 120.) The officers told him not to touch it and he closed the door and waited outside the room with them. (T. p. 120.)

The Defendant then introduced into evidence what is marked as Def.'s Exhibit DF-3 to which the Government did not object.   This document is an article entitled "The Visual Characterization and Identify of Cannabis sati sativa (Marijuana) Seeds" written by Jenna Lee Fussell, which is a thesis submitted in partial satisfaction for the requirements for the degree of Master of Science and Forensic Science at the University of California-Davis.

## IV.   Defendant is Not Entitled to a Hearing Pursuant to <u>Franks v. Delaware</u>

As United States Magistrate Judge Keesler recently explained:

> Two requirements must be met for a <u>Franks</u> hearing.   <u>Franks</u>, 438 U.S. at 156.   First, a defendant must make a preliminary showing that the affiant made a false statement intentionally or with reckless disregard for the truth in the search warrant affidavit.   <u>Id.</u> The showing must be more than conclusory and accompanied by a detailed offer of proof. Id. at 171.   Second, a defendant must show that the false statement made intentionally or with reckless disregard for the truth necessary to the finding of probable cause.   Id. at 165.

<u>United States v. Awtrey</u>, Criminal No. 1:15-cr-5, 2015 WL 4672276, at *4

(W.D.N.C. Aug. 6, 2015).

The Fourth Circuit Court of Appeals in <u>United States v. Tate</u>, 524 F.3d 449 (4th Cir. 2008), further addressed the situation where a Defendant alleges that an officer omitted facts, thereby making an affidavit for a search warrant deceptive. In <u>Tate</u>, the Fourth Circuit stated:

> When relying on an omission, rather than on a false affirmative statement, Tate's burden increases yet more. <u>United States v. Colkley</u>, 899 F.2d 297, 301 (4th Cir. 1990). As we explained in <u>Colkley</u>, an affidavit offered to procure a search warrant "cannot be expected to include …every piece of information gathered in the course of an investigation." <u>Id.</u> at 300. And because every piece of information cannot be expected to be included, the very process of selecting facts to include for the demonstration of probable cause must also be a deliberate process of omitting pieces of information. Certainly, such intentional omissions do not satisfy the requirement of <u>Franks</u>. As we stated in Colkley, "If, as the district court held, this type of 'intentional' omission is all that <u>Franks</u> requires, the <u>Franks</u> intent prerequisite would be satisfied in almost every case." <u>Id.</u> Accordingly, merely showing an intentional omission of a fact from a warrant affidavit does not fulfill <u>Franks'</u> requirements. <u>See id.</u> at 301; <u>see also</u> <u>United States v. Shorter</u>, 328 F.3d 167, 170-171 (4th Cir. 2003)
>
> To satisfy the <u>Franks'</u> intentional or reckless falsity requirement for an *omission*, the defendant must show that facts were omitted "with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading." Colkley, 899 F.2d at 300 (internal quotation marks omitted). Stated otherwise, the omission must be "*designed to mislead*" or must be made "in *reckless disregard of whether it would mislead.*" <u>Id.</u> at 301.

524 F.3d at 454-55 (emphasis in original).

In the Memorandum in support of Defendant's request for a Frank's Hearing, Defendant states, "in order to assess the truth of the information supplied by law enforcement the application therefore, the Court is required to hold a hearing pursuant to <u>Franks v. Delaware</u>, 438 U.S. 154 (1978)".    That statement is incorrect. As stated in <u>Franks</u>, an attack upon the search warrant must be more than conclusory and must be accompanied by a statement of supporting reasons, including affidavits or sworn or otherwise reliable statements of witnesses.   The Defendant, in her pleadings, did not support her motion by affidavits, sworn or otherwise, nor was there any explanation as to why such information was not filed.

Despite the failure of Defendant to support the request for a <u>Franks</u> hearing, the undersigned, out of an abundance of caution, provided Defendant with a full opportunity to call witnesses and present evidence so the Court could determine whether or not Defendant could meet her burden of proof even to the extent of allowing Defendant to call witnesses repeatedly.

In Defendant's Memorandum (#158, pp. 3-4), and in argument (T. pp. 66-67), Defendant contends that Det. Miller intentionally omitted from the Application for the search warrant that Mr. Warren was actually living in the apartment with Defendant and, further, that Mr. Warren could legally possess a firearm and the firearm was legally in the apartment. It is the Defendant's further contention that the

failure of Det. Miller to include this information in the Affidavit in support of the Application for Search Warrant, made the Affidavit misleading. The Government contends there was evidence that would indicate Defendant was illegally in possession of a firearm. (#158-1, p. 16; #184, pp. 11-12) and such information was properly presented to the Magistrate Judge in the Affidavit in support of the Application for Search Warrant.

Addressing this issue, the Court points out that 18 U.S.C. § 922(g) provides as follows:

(g)    It shall be unlawful for any person---

(1)    who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;

to ship or transport in interstate or foreign commerce; or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

Also, N.C.G.S. § 14-415.1 states:

**Possession of firearms, etc., by felon prohibited**

(a)    It shall be unlawful for any person who has been convicted of a felony to purchase, own, possess, or have in his custody, care, or control any firearm or any weapon of mass destruction as defined in G.S. 14-288.8(c).

If the Defendant was a convicted felon and had in her residence a firearm, those facts would be evidence of her commission of either of the two offenses set

forth above. The law does not require that the Defendant own the firearm, it is only required that to commit the offense, the Defendant possess the firearm or have the firearm in her custody, care or control. Actual possession is not necessary to sustain a conviction for possession; constructive possession is sufficient. United States v. Branch, 537 F.3d 328, 342-43 (4th Cir. 2008). "Constructive possession exists when an individual exercises, or has power to exercise dominion and control over the item." United States v. Laughman, 618 F.2d 1067, 1077 (4th Cir. 1980).

Testimony shows that Det. Miller, when he approached the door of the apartment, could see a gun case that was in plain view in the room. (T. p. 94.). Det. Miller asked Defendant if that was a gun and the Defendant responded that it was. (T. p. 94.) That was sufficient evidence to cause Det. Miller to have probable cause to perform an investigation to determine whether or not Defendant had committed either of the offenses described in 18 U.S.C. § 922(g) or N.C.G.S. § 14-414.1. Further, Det. Miller placed in the Affidavit in support of the Application for Search Warrant, the fact that Defendant told him the rifle was owned by Mr. Warren. (Gov.'s Exhibit F-1.)

As to the contention of the Defendant that Det. Miller intentionally omitted from the Application for the Search Warrant that Mr. Warren was actually living in the apartment with the Defendant, the evidence shows Det. Miller did not know

where Mr. Warren lived until after the search was conducted and further evidence was discovered. It was hours after the Search Warrant was issued that Det. Miller developed information that Mr. Warren lived in the apartment with the Defendant. (T. pp. 26-28, 32-33.)   Det. Miller never talked to Mr. Warren about the issue of where he lived, and Det. Miller did not even know Mr. Warren until the search was completed. (T. pp. 26, 33, 31.)   Moreover, Mr. Warren's testimony rebuts the Defendant's contention because Mr. Warren, in his testimony, denied that he lived in the apartment and testified that he was merely storing his belongings, including the rifle, in the Defendant's residence. (T. pp. 44-45, 47-51.)   Det. Miller could not aver or admit on the Affidavit in support of the Application for Search Warrant what he did not know and what stills seems to be a moving target, that being whether or not Mr. Warren lived in the apartment or just stored his belongings, including the rifle, at that residence.   As a result, Det. Miller did not omit any relevant evidence from the Application for Search Warrant regarding the rifle or its possession or where Mr. Warren lived.

In argument, Defendant's counsel contends Det. Miller intentionally omitted to inform the Magistrate Judge that the warrant for arrest of Defendant was for an offense that had occurred four years previously and it was only for the offense of driving while license revoked, and that this omission makes the Affidavit in support

of the Application for Search Warrant misleading. (T. pp. 67-68.) Det. Miller was told there was an outstanding arrest for the Defendant while he was conducting surveillance of the motel. (T. p. 30.) Two other detectives made telephone calls to confirm the existence of the warrant, which had been issued in April of 2015 for prior arrest of the Defendant. (T. p. 30.) The warrants were from Buncombe County, North Carolina and Jackson County, North Carolina and included misdemeanor and felony charges. (T. pp. 38-40.) In the Affidavit in support of the Application for Search Warrant, Det. Miller stated, "it was known to detectives on scene were aware that Tammie Payne had an active for her arrest." (Gov.'s Exhibit F-1.) This information is not misleading, nor was it made recklessly because it had been confirmed.

Finally, Defendant contends Det.'s Miller and Phillips could not identify the marijuana seeds and leaves found in Defendant's apartment. (T., pp. 107-108.) The Master's Thesis (Exhibit DF-3) has been read by the undersigned and the Court does not find that the Thesis is persuasive in any degree. Det. Miller's experience and training in controlled substance law enforcement is set forth in detail in the Affidavit in support of the Application for Search Warrant and shows he has had 32 hours of training in regard to search and seizure and crime scene searches from the North Carolina Justice Academy; Det. Miller has had approximately 66 hours of

drug interdiction training from the DEA; and he has completed 80 hours of DEA Basis Narcotics Training. The evidence presented to this issue by Defendant does not show that Det. Miller made any false statement intentionally or with reckless disregard for the truth regarding what he saw in the apartment.

The undersigned finds for the above referenced reasons that Defendant has not offered proof of any deliberate falsehood or reckless disregard for the truth of any information contained in the Affidavit in support of the Application for Search Warrant. The Defendant has further not shown that any facts were omitted with the intent to make or in reckless disregard of whether they made the Affidavit misleading. No proof has been introduced by the Defendant that the information in the Affidavit is either intentionally falsely made or with a reckless disregard to the truth or that any relevant information was omitted. The undersigned will recommend that the request for a hearing by Defendant pursuant to <u>Franks v. Delaware</u>, 438 U.S. 154 (1978) be denied. The undersigned would further point out that by allowing Defendant to call witnesses, not once, but on two occasions, instead of supporting her motion by affidavits or sworn or otherwise reliable statements of witnesses, the Defendant has had the benefit of a <u>Franks</u> hearing. Such procedures will not be allowed by the undersigned in further hearings conducted by this Court.

**V.      The Issuance of a Search Warrant for the Apartment**

The Fourth Amendment to the United States Constitution provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "This fundamental right is preserved by a requirement that searches be conducted pursuant to a warrant issued by an independent judicial officers." California v. Carney, 471 U.S. 386, 390, 105 S. Ct. 2066 (1985). When a district court reviews a search warrant issued by a magistrate or a superior court judge, the judicial officer's determination of probable cause is entitled to great deference. United States v. Wellman, 663 F.3d 224, 228 (4th Cir. 2011); United States v. Hodge, 354 F.3d 305, 309 (4th Cir. 2004). "Thus, 'the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed.'" Hodge, 354 F.3d at 309 (quoting Illinois v. Gates, 462 U.S. 213, 238-39, 103 S. Ct. 2317 (1983)). Moreover, the Court must limit its review to considering "only the information presented to the magistrate who issued the warrant." United States v. Wilhelm, 80 F.3d 116, 118 (4th Cir. 1996).

In Hodge, the United States Court of Appeals for the Fourth Circuit explained the concept of probable cause necessary for the issuance of a search warrant:

> As the Supreme Court has noted, "probable cause is a fluid concept---turning on the assessment of probabilities in particular factual contexts---not readily, or even usefully, reduced to a neat set of legal rules." Id. at 232, 103 S. Ct. 2317. Although noting that probable cause is not

susceptible to precise definition, the Supreme Court has described it as "existing where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." Ornelas v. United States, 517 U.S. 690, 696, 116 S. Ct. 1657, 134 L.Ed.2d 911 (1996); see also Gates, 462 U.S. at 238, 103 S. Ct. 2317 (explaining that a probable cause inquiry involves a determination of "whether, given all the circumstances…, there is a fair probability that contraband or evidence of a crime will be found in a particular place").

254 F.3d at 309; see also Wellman, 663 F.3d at 228 ("the relevant question is whether the known facts and circumstances were sufficient such that a person of reasonable prudence could conclude that the described evidence would be found in that particular place."). As the Fourth Circuit and Supreme Court have explained, there is no bright-rule as to what specific information a search warrant application must include, the officers may decide to include a variety of information when submitting an application to a magistrate. See Wellman, 663 F.3d at 228. Instead, the Court must review the application in its entirety and determine whether it provided sufficient information to support the issuance of the search warrant in question. Id.

Here, the facts and information contained in the Affidavit in support of the Application for Search Warrant was more than sufficient to support the issuance of the search warrant for the apartment in which Defendant resided. Initially, the Affidavit sets forth the experience and training of Det. Miller. Thereafter, the

Affidavit details the history of the investigation and the surveillance of the Super 8 Motel on June 18, 2015, by not only Det. Miller, but also other detectives. After beginning surveillance of the motel at approximately 3:30 p.m. on that day, the detectives saw at 4:45 p.m. a vehicle that contained the Defendant and another subject, Jeremy Bolin, for whom warrants were outstanding for his arrest. When the vehicle left the Super 8 Motel, other officers were notified by radio to stop the vehicle. The driver of the vehicle, Phyllis Cooper, was found to be in possession of methamphetamine. Ms. Cooper gave an inconsistent statement concerning her association with the Defendant, Tammie Payne.

The Affidavit further details how, after the vehicle stopped and the finding of the methamphetamine, the detectives went back to continue their surveillance at the Super 8 Motel and saw the Defendant near the apartment located on the second floor of the Super 8 Motel. Detectives were then advised that the Defendant, Tammie Payne, had active warrants for her arrest. At that time, the detectives saw the Defendant enter into the apartment on the second floor of the motel. The detectives approached the apartment to talk to the Defendant concerning the warrants for her arrest and at that time they saw a zippered camo long gun case setting on a table in the apartment that was in plain view of the front door. The detectives asked Defendant if there was a gun in the case and she replied there was,

but it was not hers.   The detectives then asked permission of the Defendant to look into the apartment to make sure no other guns were in the room and while doing so they found a glass pipe and marijuana leaves and seeds.   At that time, the detectives began to leave the room to obtain a search warrant and saw on the floor of the room plastic bags which the Defendant had placed in the room that contained large stacks of currency.   They further saw a metal safe near the door which was closed. While Det. Miller was preparing his application for a search warrant he was advised that the owner of the motel had located two purses in a laundry room at the motel and he had looked into the room and saw items he believed were illegal.   In short, the application provided sufficient information for the Magistrate Judge Bryson to find probable cause and to support the issuance of a search warrant for the apartment.

The pertinent question is whether the Application for the search warrant in its entirety, provided sufficient information to support the issuance of the warrant for the search of the apartment.   When considered in its entirety, and recognizing the deference to be shown to Magistrate Judge Bryson's determination, Hodge, 354 F.3d at 309, the Court finds that the known facts and circumstances as set forth in the Application for Search Warrant were more than sufficient to allow a person of reasonable prudence to conclude there was probable cause to believe the apartment contained evidence of possession of marijuana, possession of drug paraphernalia,

and possession of firearms by a convicted felon and that such evidence could be found at the apartment. <u>Wellman</u>, 663 F.3d at 228. Accordingly, the Court recommends that the District Court deny the Defendant's Motion to Suppress.


**RECOMMENDATION**

**IT IS, THEREFORE, RESPECTFULLY RECOMMENDED** that Defendant's Motion to Suppress and *Franks* Request and Memorandum in Support (#158) be **DENIED**.

Signed: August 9, 2016

Dennis L. Howell
United States Magistrate Judge

## <u>Time for Objections</u>

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C), and Rule 72, Federal Rules of Civil Procedure, written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen** (**14**) days of service of same.  **Responses to the objections must be filed within fourteen (14) days of service of the objections.**  Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal.  <u>Thomas v. Arn</u>, 474 U.S. 140 (1985), <u>reh'g</u> <u>denied</u>, 474 U.S. 1111 (1986); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir.), <u>cert</u>. <u>denied</u>, 467 U.S. 1208 (1984).